## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

TARA MURPHY,

      Plaintiff,

      vs.                                       Civ. No. 23-71 MLG/KK

MARTIN O'MALLEY, Commissioner
of the Social Security Administration,[1]

      Defendant.

### PROPOSED FINDINGS AND RECOMMENDED DISPOSITION[2]

THIS MATTER is before the Court on Plaintiff Tara Murphy's Opening Brief (Doc. 15) ("Motion"), filed June 8, 2023, in which she appeals the denial of her claims for disability insurance benefits and supplemental security income and asks the Court to remand this matter to the Social Security Administration for further proceedings including a *de novo* hearing and decision. (*Id.* at 12.) Defendant the Commissioner of the Social Security Administration ("Commissioner") filed a response in opposition to the Motion on August 11, 2023, and on September 25, 2023, Ms. Murphy filed a Notice of Completion of Briefing in which she stated that she has elected not to file a reply. (Docs. 23, 24.) Having meticulously reviewed the entire record and the relevant law, I find that the ALJ erred in assessing Ms. Murphy's residual functional capacity because her proffered reasons for omitting limitations due to Ms. Murphy's migraines, carpal tunnel syndrome, and related impairments are either inadequately explained or not

---

[1] Mr. O'Malley has been automatically substituted for his predecessor Kilolo Kijakazi as the Defendant in this suit. Fed. R. Civ. P. 25(d).

[2] By an Order of Reference (Doc. 25) entered on January 24, 2024, United States District Judge Matthew L. Garcia referred this case to me to conduct hearings, if warranted, including evidentiary hearings, and to perform any legal analysis required to recommend to the Court an ultimate disposition of the case.

supported by substantial evidence. I therefore recommend that the Court GRANT Ms. Murphy's Motion, reverse the Commissioner's decision denying benefits, and remand this matter to the Commissioner for further administrative proceedings.

## I. Factual Background and Procedural History

Ms. Murphy filed this action under 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking reversal of the Commissioner's decision denying her claims for disability insurance benefits ("DIB") under Title II, and supplemental security income ("SSI") under Title XVI, of the Social Security Act. (Docs. 1, 15.) Ms. Murphy was born in December 1976, has earned a GED, and attended one semester of college. (AR 60.[3]) She has worked as a janitor, home health aide, retail salesclerk, tortilla maker, fast-food worker, and post-construction cleaner. (AR 61-63, 71-74, 81-83.) Ms. Murphy suffers from the severe impairments of degenerative disc disease of the lumbar spine, status-post discectomy; osteoarthritis of the right hip; carpal tunnel syndrome; migraines; and, obesity. (AR 28-29.)

### A. Procedural History

Ms. Murphy applied for DIB and SSI on February 5, 2021, alleging disability beginning on October 1, 2019, due to degenerative disc disease, migraines, depression, bulging disks, anxiety, angioplasty, high blood pressure, high cholesterol, post-traumatic stress disorder, herniated disc, pinched nerve, arthritis, carpal tunnel syndrome, inability to stand for long periods, and pain in the back of her legs.[4] (AR 115, 117, 120, 143.) Her claims were denied on initial consideration in September 2021, and on reconsideration in January 2022. (AR 115, 117, 183-84.)

---

[3] Citations to "AR" refer to the Certified Transcript of the Administrative Record filed on March 23, 2023. (Doc. 9.)

[4] Ms. Murphy previously applied for DIB and SSI in June 2016, alleging disability beginning in May 2016, and ALJ Shane McGovern denied these applications in December 2018. (AR 88-102.) However, ALJ McGovern's decision is not at issue here; Ms. Murphy does not challenge it, and the Commissioner does not rely on it as a basis for issue or claim preclusion. (*See generally* Docs. 15, 23.)

Administrative Law Judge ("ALJ") Kathryn Burgchardt held a hearing on June 23, 2022, at which Ms. Murphy and an impartial vocational expert ("VE") testified. (AR 54-87.) Ms. Murphy's attorney and her partner Timothy Carter also attended the hearing. (AR 54-87.) On July 11, 2022, the ALJ issued an unfavorable decision. (AR 22-46.) The Appeals Council denied review on December 1, 2022, and the ALJ's decision became administratively final. (AR 1-3.) Ms. Murphy now seeks reversal and remand of the ALJ's decision finding that she is not disabled. (Docs. 1, 15.)

**B.** **Evidence Regarding Ms. Murphy's Carpal Tunnel Syndrome, Migraines, and Related Impairments**[5]

*1.* *Medical Record Evidence Regarding Carpal Tunnel Syndrome and Related Impairments*

Ms. Murphy saw Amanda Benedict, PA-C, for left thumb and wrist pain on March 21, 2019, about six months before her alleged onset date.[6] (AR 576.) At this appointment, Plaintiff reported right carpal tunnel surgery ten years earlier, right trigger thumb surgery in April 2018,[7] left wrist pain, and left thumb nodule and locking. (AR 576.) On examination of Ms. Murphy's left hand and wrist, PA Benedict found positive Tinel's sign[8] and Phalen's test[9] and tender medial

---

[5] Although I have meticulously reviewed the entire record, I limit my discussion of the evidence to Ms. Murphy's carpal tunnel syndrome, migraines, and related complaints, because she limits her claims of error to these impairments. (*See generally* Doc. 15.)

[6] An ALJ may consider medical record evidence outside the relevant time period if it assists the ALJ in determining whether the claimant has been disabled during the relevant period. *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004); *Hugg v. Kijakazi*, 20-cv-1250, 2022 WL 1402263, at *7 (D.N.M. May 4, 2022), *report and recommendation adopted*, 20-cv-1250, 2022 WL 2751690 (D.N.M. July 14, 2022).

[7] Other medical record evidence indicates that this surgery occurred in May 2018. (*See, e.g.*, AR 445, 672.)

[8] "Testing for Tinel's sign is a way for your healthcare provider to assess for signs of nerve damage or nerve irritation at a specific site." Cleveland Clinic, "Tinel's Sign," https://my.clevelandclinic.org/health/diagnostics/22662-tinels-sign (last accessed Jan. 24, 2024).

[9] "Phalen's test is a series of movements and positions that help your healthcare provider diagnose carpal tunnel syndrome." Cleveland Clinic, "Phalen's Test," https://my.clevelandclinic.org/health/diagnostics/25133-phalens-test (last accessed Jan. 24, 2024).

aspect and limited flexion in the distal interphalangeal thumb joint. (AR 578.) PA Benedict assessed left trigger thumb and left carpal tunnel syndrome, referred Ms. Murphy to an orthopedist, and recommended a wrist brace, rest, ice, and ibuprofen. (AR 578.) On March 27, 2019, when Ms. Murphy presented to physical therapy for neck pain, the physical therapist noted that Ms. Murphy was wearing a brace on her left wrist. (AR 1542.)

On July 17, 2019, Ms. Murphy saw orthopedist Steven Seiler, M.D., complaining of "numbness and tingling of her left hand carpal tunnel distribution," as well as "pain and locking about her left thumb and index finger," which had "become significantly bothersome to her." (AR 443.) Dr. Seiler found that Ms. Murphy's "carpal tunnel provocative tests [we]re positive for direct compression Phalen's and Tinel's," and she was "tender to palpation about the A1 pulleys of the thumb and index finger."[10] (AR 443.) He performed left carpal tunnel release, left index trigger finger release, and left thumb trigger release surgery on Ms. Murphy on July 25, 2019. (AR 453-54.)

At a post-operative appointment on August 6, 2019, Dr. Seiler noted that Ms. Murphy had no complaints and released her to "perform activities as tolerated." (AR 442.) However, on August 29, 2019, Ms. Murphy saw Lindsey Elsa Johansen, N.P., complaining of left wrist pain and rating her discomfort at eight out of ten. (AR 660-61.) Ms. Murphy told NP Johansen that she had hyperextended her left wrist while "lifting up a stack of platters." (AR 661.) She further reported that "[s]ince surgery she ha[d] had some mild weakness with gripping, and flexion," and that the incident had "exacerbated" those symptoms. (AR 661.) On exam, NP Johansen noted tenderness

---

[10] "[B]ands of tissue called pulleys hold the flexor tendons closely to the finger bones as the fingers flex and extend. The pulley at the base of each digit where the digit meets the palm is called the A1 pulley. This is the pulley that is most often involved in trigger finger." American Academy of Orthopaedic Surgeons, "Trigger Finger," https://orthoinfo.aaos.org/en/diseases--conditions/trigger-finger/ (last accessed Jan. 24, 2024).

and positive Tinel's sign and Phalen's test of the left wrist. (AR 663.) She found "an exacerbation of … ongoing carpal tunnel syndrome," prescribed ibuprofen and Medrol,[11] and imposed restrictions of "no lifting greater than 15 pounds, and to wear [a] wrist splint at all times." (AR 660.)

On December 11, 2019, Ms. Murphy saw Tricia Staatz, F.N.P.-B.C., for a "1 cm cyst palpable on volar aspect of right wrist" that had increased in size and was causing pain. (AR 551.) X-rays revealed "[n]o acute osseous abnormality." (AR 599.) Ms. Murphy also saw FNP Staatz on October 28, 2020, for an annual physical at which she reported, among other things, moderate bilateral hand pain worse with movement. (AR 529, 533.) FNP Staatz ordered x-rays and gave Ms. Murphy a sample of Voltaren.[12] (AR 537.) X-rays taken on December 14, 2020, revealed normal views of the right hand, but "[f]indings suggestive of erosive changes at the [metacarpophalangeal] joints of the second, third, and fourth fingers" of the left hand, "concerning for underlying inflammatory arthritic change." (AR 585, 808-10.) On February 1, 2021, FNP Staatz ordered blood tests and prescribed Cymbalta[13] for pain. (AR 525.) Test results from blood drawn on February 16, 2021, were normal. (AR 580-84.)

At a follow-up appointment with FNP Staatz on May 4, 2021, Ms. Murphy reported right index trigger finger, moderate right hand pain and stiffness, moderate left wrist pain with palpable lump, and dropping objects. (AR 1406-07.) FNP Staatz assessed a ganglion cyst of the volar aspect

---

[11] Medrol, or methylprednisolone, is a corticosteroid used to relieve inflammation and to treat "certain forms of arthritis." https://medlineplus.gov/druginfo/meds/a682795.html (last accessed Jan. 24, 2024).

[12] Voltaren, or diclofenac, is an over-the counter nonsteroidal anti-inflammatory drug that "is used to relieve pain from arthritis." https://medlineplus.gov/druginfo/meds/a611002.html (last accessed Jan. 24, 2024).

[13] Cymbalta, or duloxetine, is a selective serotonin and norepinephrine reuptake inhibitor that is used to, among other things, treat pain, tingling, and muscle stiffness and tenderness caused by diabetic neuropathy and fibromyalgia, and bone and muscle pain, including pain caused by osteoarthritis. https://medlineplus.gov/druginfo/meds/a604030.html (last accessed Jan. 24, 2024).

of the left wrist and right trigger index finger and referred Ms. Murphy to an orthopedist. (AR 1409.)

2.     *Medical Record Evidence Regarding Migraines and Related Complaints*

The medical records for Ms. Murphy's March 21, 2019, office visit with PA Benedict indicate that Ms. Murphy had started taking Topamax[14] a year earlier and stopped as of the date of the visit. (AR 577, 579.)

On March 27, 2019, Ms. Murphy saw Lindsay Simonds, P.T., for pain at the base of her neck down to her shoulder blades, with daily headaches beginning two weeks earlier. (AR 1542.) PT Simonds observed that Ms. Murphy "present[ed] with significant forward head and rounded shoulders as well as capital extension" and right shoulder elevation. (AR 1542.) On exam, PT Simonds found "tender[ness] to palpation with increased tissue tension appreciated in suboccipitals, [bilateral] upper trapezius, [bilateral] scalenes, and [bilateral] levator scap[ulae]." (AR 1543.) She stated that Ms. Murphy's "[e]xamination was positive for significant cervical spine dysfunction including impaired joint mobility, weakness, abnormal tissue tension and postural impairments," and recommended eight weeks of physical therapy. (AR 1543-44.)

On June 15, 2019, Ms. Murphy presented to the UCHealth Poudre Valley Hospital Emergency Department ("ED") with a "severe, generalized" headache, "photophobia and difficulty with sound," and nausea, that had started a few days earlier. (AR 703, 705.) Ms. Murphy reported a history of migraine headaches since she was 14 years old. (AR 703.) She "improved

---

[14] Topamax, or topiramate, is an anticonvulsant that is used to treat or control certain types of seizures and to "prevent migraine headaches." https://medlineplus.gov/druginfo/meds/a697012.html (last accessed Jan. 24, 2024). While there is no evidence that Ms. Murphy has had seizures, there *is* evidence that she has a long history of migraine headaches. (AR 471, 527, 703.) Thus, although the evidence does not reflect who prescribed Topamax or why, it is probable that the purpose was to prevent Ms. Murphy's migraine headaches.

significantly" with intravenous Toradol,[15] Benadryl,[16] and Compazine,[17] and was prescribed Zofran[18] on discharge. (AR 702, 706.)

On June 29, 2019, Ms. Murphy presented to the Banner Fort Collins Medical Center ED for left shoulder pain radiating to the left side of the neck, lasting three weeks and not relieved by over-the-counter medication. (AR 509.) Examination findings included limited active and passive range of motion. (AR 510.) Ms. Murphy was prescribed lidocaine[19] and Voltaren at this visit. (AR 511.)

At her October 28, 2020, annual physical with FNP Staatz, Ms. Murphy reported having two to three ocular migraines per week, as well as migraine headaches. (AR 531, 533.) Although FNP Staatz did not associate any diagnosis or treatment with this report, she did refer Ms. Murphy to a pain clinic. (AR 536-37.)

At 11:45 a.m. on December 1, 2020, Ms. Murphy presented to FNP Staatz with an "incapacitating" headache. (AR 527.) She reported an onset of "1 Day" and associated symptoms of dizziness, nausea, phonophobia, photophobia, neck stiffness, visual aura, whole-body weakness, chills, and excessive sweating. (AR 527-28.) Ms. Murphy indicated that she had a "long history of migraines," her headaches and neck and spine pain had been worse the past couple of months, and her headaches had been worse the past week. (AR 527.) On exam, FNP Staatz

---

[15] Toradol, or ketorolac, is a nonsteroidal anti-inflammatory drug used to relieve moderately severe pain, usually after surgery. https://medlineplus.gov/druginfo/meds/a693001.html (last accessed Jan. 24, 2024).

[16] Benadryl, or diphenhydramine, is an antihistamine that is used to, among other things, prevent and treat motion sickness. https://medlineplus.gov/druginfo/meds/a682539.html (last accessed Jan. 24, 2024).

[17] Compazine, or prochlorperazine, is used to, among other things, control severe nausea and vomiting. https://medlineplus.gov/druginfo/meds/a682116.html (last accessed Jan. 24, 2024).

[18] Zofran, or ondansetron, is used to prevent nausea and vomiting caused by cancer chemotherapy, radiation therapy, and surgery. https://medlineplus.gov/druginfo/meds/a601209.html (last accessed Jan. 24, 2024).

[19] Lidocaine is a local anesthetic that stops nerves from sending pain signals. https://medlineplus.gov/druginfo/meds/a603026.html (last accessed Jan. 24, 2024).

observed that Ms. Murphy was "in pain" and "lying in [a] dark room with sunglasses on, wrapped in [a] blanket," and found photophobia and a tender, enlarged left anterior cervical lymph node. (AR 529.) Although Ms. Murphy and her partner decided to go to the ED, FNP Staatz indicated that she would refer Ms. Murphy to physical therapy for neck pain and stiffness, refer Ms. Murphy to neurology if the ED did not, and consider a beta blocker for headache prevention. (AR 529.)

At 12:45 p.m. the same day, Ms. Murphy presented to the Banner Fort Collins Medical Center ED with a constant, generalized headache radiating to the back of the neck with nausea, weakness, decreased activity, and malaise. (AR 471-72.) She again reported a "long history of headaches." (AR 471.) Although the ED's medical records indicated that onset was "1 hours [sic] ago," they also indicated that the headache had started "around 1000," *i.e.*, about two hours and 45 minutes earlier. (AR 471.) Head CT scan results were normal except for "[m]ild white matter presumed chronic microangiopathic ischemic changes." (AR 591-93.) ED providers initially administered intravenous fluids, Ativan,[20] and Zofran, but Ms. Murphy was "not much improved" after this treatment, so providers also administered Valium,[21] Toradol, and Norflex[22] "with some improvement." (AR 478.) On discharge at 3:43 p.m., she was prescribed Percocet,[23] Phenergan,[24]

---

[20] Ativan, or lorazepam, is used to relieve anxiety. https://medlineplus.gov/druginfo/meds/a682053.html (last accessed Jan. 24, 2024).

[21] Valium, or diazepam, is used to, among other things, relieve anxiety and to control muscle spasms and spasticity caused by certain neurological disorders. https://medlineplus.gov/druginfo/meds/a682047.html (last accessed Jan. 24, 2024).

[22] Norflex, or orphenadrine, is a muscle relaxant used to relieve pain and discomfort caused by strains, sprains, and other muscle injuries. https://medlineplus.gov/druginfo/meds/a682162.html (last accessed Jan. 24, 2024).

[23] Percocet, or oxycodone and acetaminophen, is used to relieve moderate to severe pain. https://medlineplus.gov/druginfo/meds/ a682132.html (last accessed Jan. 24, 2024).

[24] Phenergan, or promethazine, is used to, among other things, prevent and control nausea and vomiting that may occur after surgery and to help relieve pain after surgery. https://medlineplus.gov/druginfo/meds/a682284.html (last accessed Jan. 24, 2024).

Naprosyn,[25] and Flexeril.[26] (AR 471, 479.) The following day, Ms. Murphy's primary care practice prescribed the beta blocker propranolol[27] for headache prevention. (AR 526.)

On February 17, 2021, Ms. Murphy presented to neurologist Donald Golen, M.D., with "multiple somatic complaints including chronic neck and back pain as well as headaches which are daily interspersed with migraine headaches."[28] (AR 1256.) At this appointment, Ms. Murphy reported that:  she had headaches "3-4x a week. If caught early will last 1/2 hour"; she had been "[t]aking a beta blocker every day for 2 months and that has helped migraines"; "Tylenol or ibuprofen eases pain"; and, "[n]eck pain is constant, [T]ylenol not very helpful." (AR 1256.) On exam of Ms. Murphy's neck, Dr. Golen found that she was "[v]ery tender over occipital insertion points slightly less so on cervical paraspinals and trapezius insertion points …. Cervical range of motion is preserved. Sternocleidomastoids slightly tender." (AR 1257.)

Dr. Golen assessed migraines, bilateral occipital neuralgia,[29] and chronic neck pain, writing that Ms. Murphy's

> [m]igraine headaches have improved remarkably on beta-blocker but head and neck pain persist[. P]atient does have marked increased tone in cervical paraspinal and trapezius with irritation of occipital nerves bilaterally. She is already scheduled to see a pain specialist at the end of the month and I will defer to pain specialist for

---

[25] Naprosyn, or naproxen, is a nonsteroidal anti-inflammatory drug that is used to relieve pain, tenderness, swelling, and stiffness. https://medlineplus.gov/druginfo/meds/a681029.html (last accessed Jan. 24, 2024).

[26] Flexeril, or cyclobenzaprine, is a muscle relaxant used to relieve pain and discomfort caused by strains, sprains, and other muscle injuries. https://medlineplus.gov/druginfo/meds/a682514.html (last accessed Jan. 24, 2024).

[27] Propranolol is a beta blocker used to, among other things, prevent migraine headaches. https://medlineplus.gov/druginfo/meds/a682607.html (last accessed Jan. 24, 2024).

[28] "There are over 150 types of headaches, divided into two categories: primary headaches and secondary headaches. A migraine is a primary headache, meaning that it isn't caused by a different medical condition…. A secondary headache is a symptom of another health issue." Cleveland Clinic, "Migraine Headaches," https://my.clevelandclinic.org/health/diseases/5005-migraine-headaches (last accessed Jan. 24, 2024).

[29] "Occipital neuralgia is a type of headache disorder. The condition occurs when your occipital nerves become inflamed." Cleveland Clinic, "Occipital Neuralgia," https://my.clevelandclinic.org/health/diseases/23072-occipital-neuralgia (last accessed Jan. 24, 2024).

consideration of possible occipital nerve blocks etc. In the meantime I will start patient on Lyrica[30] 50 mg at night adjusting up slowly as tolerated to see if we can gradually reduce her overall pain level. Patient continues [physical therapy] and [occupational therapy] to work on cervical … range of motion.

(AR 1256.)

Ms. Murphy saw Dr. Golen again on March 31, 2021. (AR 1258-60.) At this appointment, Dr. Golen made the same findings on examination of Ms. Murphy's neck and assessed the same headache and related disorders. (AR 1258, 1260.) He wrote that he strongly suspected Ms. Murphy had "developed a dystonia as a result of her previous drug abuse" and that he "might strongly consider centrally acting muscle relaxants." (AR 1258-59.) Meanwhile, he doubled her Lyrica dose and encouraged her to follow up with the pain specialist. (AR 1259.)

At a medication check with FNP Staatz on April 5, 2021, Ms. Murphy reported that her headaches had "decreased in duration and intensity since starting propranolol" but "still occur[red] daily." (AR 1411.) Noting that Ms. Murphy's neurologist "felt that [a] central nervous system muscle relaxer would be beneficial," FNP Staatz prescribed tizanidine[31] and encouraged Ms. Murphy to follow up with pain management. (AR 1413.) She also increased Ms. Murphy's propranolol dose. (AR 1414.)

On exam at a follow-up appointment on May 4, 2021, FNP Staatz found that Ms. Murphy's cervical spine was tender and that Ms. Murphy was "crying but consolable." (AR 1407-08.) FNP Staatz noted that Ms. Murphy had upcoming appointments with pain management and neurology but was reluctant to get injections "due to previous experiences." (AR 1408.) FNP Staatz further

---

[30] Lyrica, or pregabalin, is an anticonvulsant that is used to, among other things, relieve neuropathic pain. https://medlineplus.gov/druginfo/meds/a605045.html (last accessed Jan. 24, 2024).

[31] Zanaflex, or tizanidine, is a muscle relaxant that is used to relieve the spasms and increased muscle tone caused by, among other things, brain or spinal injury. https://medlineplus.gov/druginfo/meds/a601121.html (last accessed Jan. 24, 2024.)

noted that Ms. Murphy could not take opiates "due to history of drug abuse/addiction" but tizanidine was "helping with muscle relaxation for sleep." (AR 1408.)

On May 14, 2021, Ms. Murphy called Dr. Golen's office requesting a "bump" in her Lyrica dose "as she feels like the current do[se] is not working." (AR 1066.)

Ms. Murphy saw FNP Staatz again on June 3, 2021. (AR 1404.) FNP Staatz assessed "[f]requent [h]eadaches … although these have improved with propranolol," and again increased Ms. Murphy's propranolol dose. (AR 1404.)

On June 30, 2021, Ms. Murphy saw pain management specialist Colin Michael Carpenter, M.D. (AR 1208.) Among other things, Ms. Murphy reported "neck pain which has been going on since she was 15 or 16 years old" and that "[s]he suffers from daily headaches and migraines about 3 times per week. She has done physical therapy recently with no relief." (AR 1208.) For these and other pain-producing conditions, Dr. Carpenter prescribed baclofen[32] and diclofenac, and agreed with plans for neurology to increase her Lyrica dose. (AR 1208.) Ms. Murphy saw Dr. Carpenter again on August 9, 2021. (AR 1217.) At this appointment, Dr. Carpenter prescribed tizanidine, refilled her Lyrica prescription until she could follow up with her neurologist, and "discussed how we will not prescribe narcotics or [F]lexeril for her." (AR 1217.)

Ms. Murphy returned to Dr. Golen on August 18, 2021, reporting a "wide variety of chronic pain" including neck pain. (AR 1273.) On exam, Dr. Golen again found Ms. Murphy to be "[v]ery tender over occipital insertion points slightly less so on cervical paraspinals and trapezius insertion points" and to have "slightly tender" sternocleidomastoids. (AR 1274.) He again assessed, among

---

[32] Baclofen is a muscle relaxant that is used to treat pain and muscle stiffness and tightness from multiple sclerosis, spinal cord injuries, or other spinal cord diseases. https://medlineplus.gov/druginfo/meds/a682530.html (last accessed Jan. 24, 2024).

other things, chronic neck pain, bilateral occipital neuralgia, and migraines, and restarted Ms. Murphy's Lyrica prescription. (AR 1273.)

At a video visit with Dr. Golen on November 15, 2021, Ms. Murphy rated her head, neck, and back pain at nine out of ten. (AR 1278.) Dr. Golen noted that Ms. Murphy's chronic neck and back pain and headaches had been "resistant to all treatments so far." (AR 1277.) He also noted that she was taking Lyrica, Zanaflex, Voltaren, Cymbalta, and tizanidine. (AR 1277-78.) He again assessed chronic neck pain, bilateral occipital neuralgia, and migraines, and doubled her Lyrica dose. (AR 1277.)

At a video visit with Dr. Carpenter on December 13, 2021, Ms. Murphy asked to discuss discontinuing Lyrica due to weight gain and increased dosages. (AR 1244.) She reported that she had still been in "a lot of pain" with "some okay days but many days that hurt." (AR 1244.) Dr. Carpenter indicated that he would "defer to [Dr. Golen] to wean her off the Lyrica" before initiating a trial of gabapentin.[33] (AR 1244.) At a video visit on January 3, 2022, Dr. Golen noted that Ms. Murphy "continue[d] to have severe migraines as well as whole body neck and back pain. We will taper off of [Lyrica] in favor of gabapentin." (AR 1356.)

3.   *Other Pertinent Medical Record Evidence*

On August 27, 2021, Ms. Murphy presented to Tina Rose, Psy.D., for a consultative psychological examination. (AR 1154.) Dr. Rose noted that Ms. Murphy "received a ride" to the appointment and that she had a valid driver's license but her "primary mode of transportation [was] receiving rides from others." (AR 1154.)

Regarding Ms. Murphy's work history, Dr. Rose wrote that she had

---

[33] Gabapentin is used to, among other things, relieve the pain of postherpetic neuralgia and diabetic neuropathy "by changing the way the body senses pain." https://medlineplus.gov/druginfo/meds/a694007.html (last accessed Jan. 24, 2024).

last worked doing construction cleanup. She started work on 11/2019 which ended
on 1/3/2020. She stopped working because she was fired. She reported being fired
because she was "unable to do the job they wanted her to do" adding "I can't
perform required tasks such as bending, twisting/turning, sitting, standing or
lifting."

(AR 1156.)

Regarding Ms. Murphy's activities of daily living, Dr. Rose wrote:

[w]hen asked how her condition has affected her ability to do chores and activities,
she stated she is able to cook meals, make her bed, do laundry, vacuum, dust
furniture, do dishes, prepare simple meals, run errands, and go grocery shopping.
Claimant reported "my condition has decreased my ability to do things like chores
...". She is not able to "be out to[o] long without causing more pain." She does
perform all necessary self-care activities independently and she is currently
bathing. She does not take care of any small children. Her hobbies and fun activities
include photography, crafts, fishing, drawing, singing.

(AR 1156.)

Ms. Murphy told Dr. Rose that she was "in physical pain '24/7,'" and Dr. Rose observed

that Ms. Murphy "appeared to have some moderate pain" at the appointment. (AR 1155, 1158.)

Dr. Rose further wrote that Ms. Murphy "does appear to be doing chores around the house and

some activities during the day along with engaging in adequate self-care although she does report

completing these tasks and activities with pain." (AR 1159-60.)

    *4.    Prior Administrative Findings Regarding Ms. Murphy's Physical Residual
        Functional Capacity ("RFC")*[34]

On July 16, 2021, Robert Pratt, M.D., reviewed Ms. Murphy's medical records and found

that she could: (1) frequently lift, carry, push, and/or pull ten pounds; (2) stand and/or walk for a

total of two hours per workday; (3) sit for a total of six hours per workday; (4) occasionally

balance, stoop, kneel, crouch, crawl, and climb ramps or stairs; and, (5) never climb ladders, ropes,

or scaffolds. (AR 130-33, 153-56.) Dr. Pratt also found that Ms. Murphy should avoid all exposure

---

[34] An individual's RFC is "the most [the individual] can still do despite [her physical and mental] limitations." 20
C.F.R. §§ 404.1545(a)(1), 416.945(1)(1).

to hazards. (AR 133, 156.)

On July 17, 2021, Virginia Thommen, M.D., reviewed Ms. Murphy's medical records and found that she could:  (1) occasionally lift, carry, push, and/or pull 20 pounds; (2) frequently lift, carry, push, and/or pull ten pounds; (3) stand and/or walk for a total of six hours per workday; (4) sit for a total of six hours per workday; (5) frequently kneel, crouch, and climb ramps or stairs; (6) occasionally stoop, crawl, and climb ladders, ropes, or scaffolds; and, (7) frequently finger with her left hand. (AR 134-36, 156-59.) Dr. Thommen explained that Ms. Murphy's "[left] fingering [was] limited to frequent due to [left] hand [metacarpophalangeal osteoarthritis]." (AR 136, 159.)

On July 19, 2021, Aaron Snyder, M.D., reviewed Ms. Murphy's medical records and found that she could:  (1) occasionally lift, carry, push, and/or pull 20 pounds; (2) frequently lift, carry, push, and/or pull ten pounds; (3) stand and/or walk for a total of more than six hours per workday; and, (4) sit for a total of more than six hours per workday. (AR 136-38, 159-61.)

Finally, on January 21, 2022, Erin Madden, M.D., reviewed Ms. Murphy's medical records and found the same limitations as Dr. Pratt, except that Dr. Madden found Ms. Murphy should avoid "[c]oncentrated" exposure to hazards. (AR 170-72, 179-81.)

5.    *Pertinent Portions of Adult Function Report and Hearing Testimony*

In an Adult Function Report dated May 13, 2021, Ms. Murphy indicated that she cares for her dog when she can but when she cannot, her boyfriend does it for her. (Doc. 9-2 at 3; AR 379.) She indicated that she has no problems with personal care. (AR 379.) She reported that she does not cook as much as she used to and that her boyfriend helps her cook when she cannot, but she prepares food daily. (AR 380.) Ms. Murphy also reported doing "some light cleaning" and "some laundry" without lifting or while sitting, and that her boyfriend helps with these chores. (AR 380.) She indicated that she goes outside and shops two to three times a week for one to two hours, and

drives and rides in a car, but does not go out alone and "can't be out to[o] long [without] causing more pain." (AR 381.) She wrote that her hobbies are crafts and photography, but she does not do them as often since her impairments began and cannot do them well "because of the pain." (AR 382.) She noted that she cannot use her hands without pain or help. (AR 383.)

At her June 2022 hearing, Ms. Murphy testified that from November 2019 to January 3, 2020, after her alleged onset date, she worked "clean[ing] up the mess from the construction workers" in newly constructed homes. (AR 61-63, 74.) Ms. Murphy explained that she was fired from this job because she "could not keep up with the tasks that they wanted [her] to perform" and "it was physically hurting [her]." (AR 62-63.)

Ms. Murphy testified that she lives in an RV with Mr. Carter, her adult son, a dog, two cats, and a lizard. (AR 63, 65.) Ms. Murphy further testified that Mr. Carter is disabled and that he or her son is usually with her. (AR 64-65.) She explained that she gave up grocery shopping about six months before the hearing, but she can prepare small, simple meals. (AR 75-76.) She stated that her son has done the household laundry since September 2021 because, among other things, she "can't lift … the baskets or the bags" and "can't do stairs, especially carrying anything," adding that she has "really no strength in [her] hands" and "can barely carry a gallon of milk." (AR 75-78.) She elaborated: "Some days I can't even pick up a pot pan. Like today, it shoots pain in my wrists." (AR 77-78.) She also testified that she has a hard time holding eating utensils, explaining, "I'll be eating and the spoon or fork will just fall out of my hand[.]" (AR 78.)

Ms. Murphy testified that she has not used methamphetamine for three and a half years, but she smokes marijuana daily "all day long" for her pain. (AR 69-70.) She stated that "just turn[ing] her neck" can cause a migraine and when she has a headache, "three out of four days [she] can't even get out of bed, because [her] head hurts so bad." (AR 78.)

Ms. Murphy indicated that she has a driver's license but does not drive. (AR 67.) She explained that she does not have a vehicle and does not "really go out of the house," except when Mr. Carter and her son "walk right with [her]" to "the shower house." (AR 67.) She added that she might take the bus if she needs to go to the doctor. (AR 67.) Ms. Murphy testified that she loves photography and crafts but has not gone fishing for at least ten years or drawn for at least five years. (AR 68.) She also indicated that she does not exercise at all because "[i]t hurts [her] just to walk from [her] kitchen to [her] bedroom." (AR 69.)

At the hearing, the VE testified that a hypothetical individual with Ms. Murphy's assessed RFC would not be able to perform any of Ms. Murphy's past relevant work but would be able to perform the requirements of semiconductor bonder, call out operator, and laminator. (AR 83-84.) However, the VE also testified that, if this hypothetical individual would also miss at least three days of work per month on an unscheduled basis, or could only occasionally handle and finger, there would be no available work. (AR 84-86.)

## II.  **The ALJ's Decision**

In her unfavorable decision, the ALJ applied the Commissioner's five-step sequential evaluation process.[35] (AR 22-46.) At step one, the ALJ found that Ms. Murphy has not engaged in

---

[35] The five-step sequential evaluation process requires the ALJ to determine whether:

(1)     the claimant engaged in substantial gainful activity during the alleged period of disability;
(2)     the claimant has a severe physical or mental impairment (or combination of impairments) that meets the duration requirement;
(3)     any such impairment meets or equals the severity of an impairment listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P;
(4)     the claimant can return to her past relevant work; and, if not,
(5)     the claimant is able to perform other work in the national economy, considering her RFC, age, education, and work experience.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant has the burden of proof in the first four steps of the analysis and the Commissioner has the burden of proof at step five. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). A finding that the claimant is disabled or not disabled at any point in the process is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

substantial gainful activity since her alleged onset date of October 1, 2019. (AR 28.) In this regard, the ALJ concluded that Ms. Murphy's job doing construction clean-up was "an unsuccessful work attempt" because it lasted less than six months and Ms. Murphy did not return to any work activity afterward. (AR 28.)

At step two, the ALJ found that Ms. Murphy suffers from the severe impairments of: degenerative disc disease of the lumbar spine, status-post discectomy; osteoarthritis of the right hip; carpal tunnel syndrome; migraines; and, obesity. (AR 28-29.) At step three, the ALJ determined that these impairments or combinations of impairments do not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 33.)

At step four, [36] the ALJ determined that Ms. Murphy has the RFC

> to perform sedentary work as defined in 20 CFR [§§] 404.1567(a) and 416.967(a) meaning she could only lift or carry 10 pounds frequently and 10 pounds occasionally. She could stand and/or walk, with normal breaks, for a total of 2 hours in an 8-hour workday. She could sit, with normal breaks, for a total of 6 hours in an 8-hour workday. She could perform pushing and pulling motions with upper and lower extremities, within the aforementioned weight restrictions given. She should avoid unprotected heights and moving machinery. She could perform postural activities of climbing of ramps or stairs, balancing, stooping, crouching, kneeling and crawling occasionally. She should not climb any ladders, ropes or scaffolds on the job.

(AR 35.) In light of this RFC, the ALJ concluded that Ms. Murphy is unable to perform any of her past relevant work as an industrial cleaner, home attendant, tortilla maker, fast food worker, or retail salesclerk. (AR 43.)

---

[36] Step four involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ must consider all of the relevant evidence and determine the claimant's RFC. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). Second, the ALJ must determine the physical and mental demands of the claimant's past work. *Winfrey*, 92 F.3d at 1023. Third, the ALJ must determine whether the claimant is capable of meeting those demands given her RFC. *Id.* A claimant who can perform her past relevant work is not disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f).

However, at step five, the ALJ found that an individual of Ms. Murphy's age and with her education, work experience, and assessed RFC could perform other jobs existing in significant numbers in the national economy. (AR 44.) Specifically, the ALJ determined that an individual with Ms. Murphy's characteristics could perform the requirements of the representative occupations of semiconductor bonder, call out operator, and laminator. (AR 44-45.) The ALJ therefore concluded that Ms. Murphy was not disabled from October 1, 2019, through the date of the ALJ's decision. (AR 45.)

### III. <u>Standard of Review</u>

A federal court's review of the Commissioner's final decision is limited to determining whether substantial evidence supports the ALJ's factual findings and whether the ALJ applied the correct legal standards to evaluate the evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). In making these determinations, a court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the agency. *Flaherty v. Astrue*, 515 F.3d 1067, 1070-71 (10th Cir. 2007). In other words, courts do not reexamine the issues *de novo*. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993). Courts will not disturb the agency's final decision if it correctly applies legal standards and is based on substantial evidence in the record.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). It is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). A federal court's examination of the record as a

whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

"The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (quotation marks and brackets omitted). Although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence," and "in addition to discussing the evidence supporting [her] decision, the ALJ also must discuss the uncontroverted evidence [she] chooses not to rely upon, as well as significantly probative evidence [she] rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). If the ALJ fails to do so, "the case must be remanded for the ALJ to set out [her] specific findings and [her] reasons for accepting or rejecting evidence[.]" *Id.* at 1010.

## IV.  <u>Analysis</u>

Ms. Murphy contends that the ALJ committed reversible error in denying her claims for DIB and SSI because: (1) the RFC the ALJ assessed does not adequately account for Ms. Murphy's limitations due to her carpal tunnel syndrome, migraines, and related impairments; and, (2) the ALJ improperly assessed Ms. Murphy's subjective complaints associated with these impairments. (Doc. 15.) For the following reasons, I propose to find that Ms. Murphy's arguments are well taken and recommend that her request for remand be granted.[37]

**A.**      **The ALJ did not adequately explain why she omitted from Ms. Murphy's RFC any manipulative limitations due to Ms. Murphy's carpal tunnel syndrome and related impairments.**

---

[37] Because Ms. Murphy's two claims of error are intertwined, I analyze the ALJ's assessment of Ms. Murphy's subjective complaints together with the ALJ's assessment of the other record evidence relevant to Ms. Murphy's carpal tunnel syndrome, migraines, and related impairments.

Ms. Murphy first challenges the RFC the ALJ assessed because it does not include any manipulative limitations due to her carpal tunnel syndrome and related impairments.[38] (Doc. 15 at 7-12.) As a preliminary matter, the Commissioner argues that this objection fails because Ms. Murphy has not identified what additional limitations the ALJ should have assessed. (Doc. 23 at 6.) In so arguing, however, the Commissioner fails to acknowledge not only Ms. Murphy's reference to "manipulative limitations," (Doc. 15 at 8), but also her counsel's specific hypothetical question to the VE regarding the manipulative limitations of "occasional[] handl[ing] and finger[ing]." (AR 85.) Thus, Ms. Murphy has sufficiently identified the limitations related to her hand and wrist disorders that she claims the ALJ should have included.

Explaining the RFC she assessed, the ALJ wrote that Ms. Murphy's "history of bilateral carpal tunnel release but no abnormal clinical findings and no problem with routine manipulative activities including self-care, household chores, driving and some work activity at the very heavy exertion level do not support further manipulative limitations." (AR 41.) However, as discussed below, the ALJ's proffered reasons for omitting manipulative limitations from the challenged RFC are either inadequately explained or not supported by substantial evidence.

First, the ALJ's reference to "no abnormal clinical findings" is plainly incorrect. (AR 41.) In March 2019, PA Benedict's examination findings included positive Tinel's sign and Phalen's test of the left wrist and tender medial aspect and limited flexion in the distal interphalangeal joint of the left thumb. (AR 578.) In July 2019, Dr. Seiler found that Ms. Murphy's left "carpal tunnel provocative tests [we]re positive for direct compression Phalen's and Tinel's" and that she was

---

[38] As noted in Section II., *supra*, the challenged RFC does limit Ms. Murphy to lifting, carrying, pushing, and/or pulling ten pounds occasionally and less than ten pounds frequently, and these limitations do appear to address some of the reported symptoms caused by Ms. Murphy's hand and wrist impairments, as well as other symptoms not at issue here. (AR 35.) For example, they more than adequately address NP Johansen's August 2019 restriction that Ms. Murphy lift no more than 15 pounds. (AR 660.) However, these limitations are "exertional," not "manipulative." *See, e.g.*, Social Security Administration, Program Operations Manual System (POMS) DI §§ 25001.001(A)(19), (21), 25025.030(D)(4).

"tender to palpation about the A1 pulleys of the thumb and index finger." (AR 443.) In August

2019, NP Johansen found tenderness and positive Tinel's sign and Phalen's test of the left wrist.[39]

(AR 663.) In December 2019, FNP Staatz noted a palpable cyst on the volar aspect of Ms.

Murphy's right wrist. (AR 551.) A December 2020 x-ray of Ms. Murphy's left hand revealed

"[f]indings suggestive of erosive changes at the [metacarpophalangeal] joints of the second, third,

and fourth fingers." (AR 808.) And in May 2021, FNP Staatz noted a palpable ganglion cyst on

the volar aspect of Ms. Murphy's left wrist. (AR 1406-09.) Thus, the ALJ's reference to "no

abnormal clinical findings" is not supported by substantial evidence. *See Pickup v. Colvin*, 606 F.

App'x 430, 433 (10th Cir. 2015) (ALJ's conclusion was not supported by substantial evidence

where it was belied by a letter in the record); *Stills v. Astrue*, 476 F. App'x 159, 161 (10th Cir.

2012) (agency's reasoning was not supported by substantial evidence where it was "incorrect").

Moreover, although the ALJ appeared to discount "inflammatory arthritis signs" in Ms.

Murphy's left hand on the basis that "laboratory findings routinely show negative ANA screen,"

there are three problems with this reasoning. (AR 39.) First, although the ALJ stated that Ms.

Murphy's ANA screens were "routinely" negative, in support, she cited to duplicate records of a

single ANA screen on February 16, 2021, (AR 39 (citing AR 582, 1420)); and, a single test result

cannot fairly be said to have occurred routinely. In this regard, the ALJ's reasoning is not supported

---

[39] Notably, the ALJ failed to address Ms. Murphy's August 2019 appointment with NP Johansen in her step-four discussion of Ms. Murphy's hand and wrist impairments. (AR 39, 41.) At this appointment, Ms. Murphy reported an exacerbation of ongoing post-operative numbness and weakness with left hand gripping and flexion, causing discomfort at eight out of ten. (AR 660-63.) In addition, NP Johansen made clinical findings of left wrist tenderness and positive Phalen's test and Tinel's sign, found ongoing carpal tunnel syndrome, prescribed a corticosteroid, and instructed Ms. Murphy to wear a wrist splint. (AR 660-63.) It is unclear whether the ALJ considered any of this significantly probative evidence in assessing Ms. Murphy's RFC. The Commissioner argues that "the genesis of [Ms. Murphy's] wrist pain" at this appointment "was an injury," and that though she had had some mild weakness after surgery, "she nevertheless had a full range of motion and sensation." (Doc. 23 at 7.) But the ALJ did not offer these reasons for discounting the medical record evidence regarding the appointment. (AR 39, 41.) Thus, the Commissioner's arguments are post-hoc rationalizations that the Court may not consider. *Haga v. Astrue*, 482 F.3d 1205, 1207–08 (10th Cir. 2007); *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004); *Allen v. Barnhart*, 357 F.3d 1140, 1142 (10th Cir. 2004).

by substantial evidence.

Second, the ALJ failed to explain why a negative ANA screen would necessarily rule out the "inflammatory arthritic change process" that the radiologist thought may have caused the "erosive changes" seen in the December 2020 x-ray of Ms. Murphy's left hand. (AR 39, 808-09); *see, e.g.*, Medline Plus, "ANA (Antinuclear Antibody) Test," https://medlineplus.gov/lab-tests/ana-antinuclear-antibody-test/ (last accessed Jan. 24, 2024) ("[A] negative ANA test doesn't completely rule out the possibility that you could have an autoimmune disorder."). Third, and most importantly, even if the negative screen did rule out a possible *cause* for the erosive changes in question, the ALJ failed to explain why it would in any way negate the *existence* of these changes. (AR 39.) In these respects, the ALJ did not adequately explain her apparent rejection of the abnormal December 2020 x-ray of Ms. Murphy's left hand.

Also problematic is the ALJ's next proffered reason for omitting manipulative limitations from the challenged RFC, *i.e.*, that Ms. Murphy has "no problem with routine manipulative activities including self-care, household chores, [and] driving." (AR 41.) In her step-four discussion, the ALJ appeared to discount Ms. Murphy's June 2022 testimony regarding her inability or limited ability to cook, do household chores, shop, and drive based on Ms. Murphy's August 2021 report to Dr. Rose that she was able to "perform self-care, cook, vacuum, dust, do the laundry and wash dishes, shop for groceries, run errands, … and drive without assistance." (AR 36 (citing AR 1156); *see* AR 75-78.) However, the ALJ did not discuss that Ms. Murphy also told Dr. Rose "[h]er primary mode of transportation is receiving rides from others," she cannot "be out to[o] long without causing more pain," her "condition has decreased [her] ability to do things like chores," and she is "in physical pain '24/7'." (AR 36, 1154-56.) In addition, the ALJ failed to address Dr. Rose's observation that, although Ms. Murphy "does appear to be doing chores around

the house and some activities during the day along with engaging in adequate self-care … she does report completing these tasks and activities with pain." (AR 36, 1159-60.) It is thus unclear whether the ALJ considered any of this evidence documenting problems with routine manipulative activities.

Further, although the ALJ did acknowledge Ms. Murphy's May 2021 report to FNP Staatz that she drops objects, the ALJ appeared to discount this evidence on the bases that FNP Staatz "noted no physical observations of the bilateral hands" and no testing at this appointment, and providers noted "no abnormal physical or neurological findings" at appointments in July 2021 and September 2021.[40] (AR 39.) But the ALJ failed to discuss FNP Staatz's notation of a "palpable" ganglion cyst on Ms. Murphy's left wrist at the May 2021 appointment, and it is therefore unclear whether she considered this contradictory evidence. (AR 39, 1407, 1409.) Also, the ALJ did not mention that in July and September 2021, Ms. Murphy saw PA Benedict to discuss prediabetes and folliculitis on her groin, hip, breast, and abdomen, (AR 1387, 1392-94), and, in July 2021, Ms. Murphy saw FNP Staatz for a wart and gastritis, (AR 1397). (AR 39.) Nor did the ALJ explain why Ms. Murphy's providers could be expected to make findings about chronic hand and wrist joint issues at appointments for unrelated health concerns. (AR 39.) Thus, absent further explanation, the Court cannot determine whether the ALJ properly considered the evidence regarding Ms. Murphy's May 2021 appointment with FNP Staatz, which also documents problems with manipulating objects.

Regarding driving in particular, the ALJ did acknowledge Ms. Murphy's June 2022 testimony that she no longer drives. (AR 36.) However, the ALJ attributed this testimony solely to

---

[40] In this portion of her decision, the ALJ referred to "no abnormal physical or neurological findings" at primary care appointments in July 2021 and *November* 2021. (AR 39.) However, the records to which she cited document primary care appointments in July 2021 and *September* 2021. (AR 39 (citing AR 1389, 1394, 1398).)

the fact that Ms. Murphy "has no vehicle," and failed to discuss Ms. Murphy's additional testimony that she does not "really go out of the house" except to walk to "the shower house" and to take the bus to doctor's appointments. (AR 36, 67.) It is thus unclear whether the ALJ properly considered Ms. Murphy's testimony regarding driving.

If all of the foregoing were not enough to undermine the ALJ's reasoning that Ms. Murphy has "no problem with routine manipulative activities," the ALJ wholly failed to mention other significantly probative evidence undercutting this reasoning. (AR 41.) For example, the ALJ did not discuss Ms. Murphy's testimony that she "really has no strength in [her] hands," "can barely carry a gallon of milk," "[s]ome days … can't even pick up a pot pan," and has a hard time holding eating utensils. (AR 36, 41, 77-78.) Also omitted from the ALJ's discussion are Ms. Murphy's statements, in her adult function report, that though she sometimes cares for her dog, prepares food, does light cleaning and laundry, shops, and drives, she receives help from Mr. Carter to perform these activities and only goes outside two to three times per week for about one to two hours. (AR 36, 41, 379-83.) Nor did the ALJ note Ms. Murphy's reports that she does not do crafts or photography as often since her impairments began, cannot do them well "because of the pain," and cannot use her hands "without pain or having to have help." (AR 382-83.)

Of course, "[c]redibility determinations are peculiarly the province of the finder of fact, and [the Court] will not upset such determinations when supported by substantial evidence." *Cowan v. Astrue*, 552 F.3d 1182, 1190 (10th Cir. 2008) (quotations and citations omitted). Still, "findings as to credibility should be closely and affirmatively linked to substantial evidence." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (citations, quotations, and alterations omitted). And here, the ALJ did not even mention the foregoing testimony and reports regarding Ms. Murphy's problems with routine manipulative activities, much less link any determination about

their credibility to substantial evidence in the record. In all of these respects, the ALJ did not adequately discuss significantly probative evidence undercutting her finding that Ms. Murphy has "no problem with routine manipulative activities including self-care, household chores, [and] driving."[41] (AR 41.)

Perhaps most troubling is the ALJ's last proffered reason for omitting manipulative limitations from the challenged RFC, *i.e.*, that Ms. Murphy had "no problem" with "some work activity at the very heavy exertion level." (AR 41.) Ms. Murphy does not dispute that, for a short period after her alleged onset date, she worked "clean[ing] up the mess from the construction workers" in newly constructed homes. (AR 28, 61-63, 74.) Nor does she dispute that, as the VE testified, this work was at a very heavy exertional level. (AR 82.) However, Ms. Murphy testified, and also told Dr. Rose, that she was fired from this job after about two months because she was unable to perform the required tasks and it was hurting her. (AR 62-63, 1156.)

The ALJ appeared to discount Ms. Murphy's testimony and report that she was fired from the construction clean-up job for being unable to meet its requirements, on the basis that Ms. Murphy elsewhere "reported she quit." (AR 28.) But the record the ALJ cited does not support her reasoning. Specifically, the ALJ cited to a March 2021 Work Activity Report, Form SSA-821-BK,

---

[41] Elsewhere in her step-four discussion, the ALJ stated that in July 2021, Ms. Murphy "reported she exercised 3 to 4 times per week with 'biking,'" (AR 38 citing AR 1178-80)), and "[p]rior to discectomy," she "reported she walked 1-2 miles, swam 3-4 hours and rode a bicycle 4+ hours fairly regularly about 2-3 times per week." (AR 41 (citing AR 439, 664, 1156).) However, even if the ALJ had relied on these reasons to justify the omission of any manipulative limitations from the challenged RFC, they would not, absent further explanation, constitute substantial evidence to support the omission. First, the cited report of biking three to four times per week appears only in Ms. Murphy's "[p]ast [m]edical [h]istory," and not in any notation regarding what Ms. Murphy told her provider about her activities at the July 2021 appointment in question. (AR 1176-81.) Second, the cited report of extensive walking, swimming, and bicycling appears only under the heading, "[g]eneral [c]onditioning," in a January 2020 orthopedic questionnaire in which Ms. Murphy also indicated that: (a) her then-current medical problems "limit[ed]/interfere[d] with: sitting, standing, bending, twisting, squatting[,] lifting [and] reaching"; (b) she was unable to "safely/comfortably" sit, stand, or walk for more than ten minutes or lift more than five pounds; (c) her "present symptoms" began three to four months earlier; and, (d) she wanted "[t]o set up a date for surgery." (AR 439-40.) Notably, Dr. William Biggs performed the sought-after surgery the following month in order to treat "a fairly large extruded fragment disc herniation that [was] compressing her S1 nerve root." (AR 438, 636-38.)

which asked, "did you make any of the changes below" with respect to the job in question. (AR 28, 369.) In response, Ms. Murphy checked the box for "Yes, Stopped working." (AR 369.) But nowhere on this form did she indicate that she stopped working because she quit, as opposed to being fired; indeed, the form did not include any boxes that asked Ms. Murphy to make this distinction. (AR 365-71.)

Furthermore, whether she was fired or quit, it is uncontroverted that she stopped working at this job due to her impairments. (AR 62-63, 369, 1156.) Specifically, in addition to her testimony and report to this effect, on the March 2021 Work Activity Report, Ms. Murphy checked the box for "My physical and/or mental condition(s)" as the "Reason[]" why she stopped working. (AR 369.) Thus, the ALJ's exclusion of any manipulative limitations from the challenged RFC on the basis that Ms. Murphy had "no problem with … some work activity at the very heavy exertion level" is not supported by substantial evidence. (AR 41.); *Pickup*, 606 F. App'x at 433; *Stills*, 476 F. App'x at 161.

Finally, although the ALJ did not cite this as a reason for omitting any manipulative limitations from the challenged RFC, I note that the ALJ rejected Dr. Thommen's July 17, 2021 prior administrative findings, including her finding that Ms. Murphy should be limited to frequent fingering with the left hand due to osteoarthritis, (AR 136, 159), on the basis that these findings were "not as persuasive as Dr. Pratt's [findings] and cover[] a period less than 12 months in duration given the recently expired date last insured of March 31, 2022." (AR 42.) But there are three problems with these proffered reasons.

First, although Ms. Murphy does not dispute that her date last insured was March 31, 2022, she has applied for SSI as well as DIB, and a claimant seeking SSI need not prove disability prior to her date last insured. (Doc. 15; AR 25-26); *Gabaldon v. Barnhart*, 399 F. Supp. 2d 1240, 1250

(D.N.M. 2005) (citing Soc. Sec. Ruling 83-20, 1983 WL 31249, at *1). Further, although Dr. Thommen made her findings in July 2021, the arthritic changes on which Dr. Thommen relied were seen on x-ray in December 2020, (AR 808-10), well over a year before the ALJ's July 2022 decision.

Second, the ALJ wholly failed to explain why she found Dr. Thommen's inclusion of a fingering limitation less persuasive than Dr. Pratt's omission of any such limitation. (AR 42.)

And third, even if the Court were to assume that the ALJ found Dr. Thommen's inclusion of a fingering limitation unpersuasive for the rather vague reasons she gave for adopting Dr. Pratt's findings, these reasons are inadequately supported insofar as they relate to Ms. Murphy's hand and wrist impairments. In adopting Dr. Pratt's findings, the ALJ cited to "objective clinical findings," "no noted problems with personal care," "normal physical examination findings," "mild diagnostic evidence," and "independent activities of daily living." (AR 42.) However, as already discussed, the ALJ failed to adequately explain why she rejected significantly probative evidence of abnormal clinical and examination findings regarding Ms. Murphy's hands and wrists, as well as Ms. Murphy's reports and testimony about problems with routine manipulative activities. (AR 39, 41-42; *see, e.g.,* AR 67, 75-78, 379-83, 660-63, 808-10, 1154-56, 1159-60, 1406-07, 1409.) For these reasons, the ALJ did not adequately explain her rejection of Dr. Thommen's finding limiting Ms. Murphy to frequent left-hand fingering. *Frantz v. Astrue*, 509 F.3d 1299, 1302–03 (10th Cir. 2007); *Haga v. Astrue*, 482 F.3d 1205, 1208–09 (10th Cir. 2007); *Givens v. Astrue*, 251 F. App'x 561, 568 (10th Cir. 2007).

In sum, in all of the foregoing respects, the ALJ did not adequately "discuss the uncontroverted evidence [she chose] not to rely upon, as well as significantly probative evidence" she appears to have rejected, in omitting any manipulative limitations from the challenged RFC.

*Clifton*, 79 F.3d at 1009-10. As such, she did not provide the Court with "a sufficient basis to determine that appropriate legal principles have been followed" and that substantial evidence supports her decision. *Jensen*, 436 F.3d at 1165. Because the ALJ did not adequately explain why she omitted from Ms. Murphy's assessed RFC any manipulative limitations resulting from Ms. Murphy's hand and wrist impairments, I recommend that the Court grant Ms. Murphy's Motion and remand this matter to the Commissioner for further proceedings.

**B.      The ALJ did not adequately explain why she omitted from Ms. Murphy's RFC any limitations due to Ms. Murphy's migraines and related impairments.**

Ms. Murphy also objects that the RFC assessed by the ALJ does not include any limitations due to her migraines and related impairments. (Doc. 15 at 7-12.) As a preliminary matter, the Commissioner argues that the RFC's limitations of sedentary work, with occasional postural activities and avoidance of unprotected heights and moving machinery, relate to these impairments. (Doc. 23 at 8-9.) However, it is unclear how any of the limitations on which the Commissioner relies would address Ms. Murphy's reported symptoms arising out of her headaches, including pain provoked by simple movements like turning her neck, pain so severe she often cannot get out of bed, nausea, photophobia, and phonophobia. (*See, e.g.*, AR 78, 527-29, 702-05.) Nor did the ALJ expressly link any of the relied-upon limitations to Ms. Murphy's headache disorders, as opposed to her other severe physical impairments. (AR 35-42.)

At Ms. Murphy's hearing, the ALJ did ask the VE whether there would be available work for a hypothetical individual with the challenged RFC, who was also "unable to consistently fulfill work for 8 hours a day, 5 days a week … because this individual would miss at least 3 days in a work month on an unscheduled basis." (AR 84.) This additional hypothetical limitation would have partially addressed some of the reported symptoms related to Ms. Murphy's headache disorders. (*See, e.g.*, AR 527 (in December 2020, Ms. Murphy saw FNP Staatz for an

"incapacitating" headache); AR 1256 (in February 2021, Ms. Murphy told Dr. Golen she had headaches three to four times per week); AR 1411 (in April 2021, Ms. Murphy told FNP Staatz she had headaches daily); AR 1209 (in June 2021, Ms. Murphy told Dr. Carpenter she had headaches daily and migraines about three times per week); AR 78 (in June 2022, Ms. Murphy testified that when she has a headache, three days out of four, her pain is "so bad" she "can't even get out of bed").) However, the ALJ did not include this limitation in the challenged RFC. (AR 35.) Nor did she include any environmental limitations associated with Ms. Murphy's headaches, despite medical record evidence that Ms. Murphy's migraines cause photophobia and phonophobia and are aggravated by bright lights. (AR 35; *see* AR 527-29, 702-05.) In short, the ALJ did not in fact include any limitations related to Ms. Murphy's headache disorders in the challenged RFC.

The ALJ did not specifically state why she omitted any limitations related to Ms. Murphy's headache disorders from the challenged RFC. (AR 35-42.) The ALJ did write, more generally, that Ms. Murphy's "normal physical examination findings, the mild diagnostic evidence and the claimant's independent activities of daily living do not support greater limitations" than those included in the RFC. (AR 41.) But as discussed below, these reasons are either inadequately explained or not supported by substantial evidence.

First, insofar as it relates to Ms. Murphy's headache disorders, the ALJ's reference to "normal physical examination findings" is plainly incorrect. Indeed, in her step-four discussion of the medical record evidence regarding Ms. Murphy's migraines, the ALJ actually listed an abnormal physical examination finding, *i.e.*, Dr. Golen's February 2021 finding of "marked increased tone in cervical paraspinal and trapezius with irritation of occipital nerves bilaterally." (AR 40 (citing AR 619, 1256).) The ALJ appeared to discount this abnormal finding on the basis that Dr. Golen also found normal range of motion of the cervical and lumbar spine, intact cranial

nerve function and reflexes, and normal motor strength. (AR 40.) However, she failed to explain

how the latter findings might contradict the former, nor is such a contradiction obvious.

In addition, the ALJ failed to discuss the many other abnormal physical examination

findings supporting Ms. Murphy's providers' assessments of migraines and bilateral occipital

neuralgia, including:

- PT Simonds' March 2019 observations that Ms. Murphy "present[ed] with significant forward head and rounded shoulders as well as capital extension" and right shoulder elevation, "tender[ness] to palpation with increased tissue tension appreciated in suboccipitals, [bilateral] upper trapezius, [bilateral] scalenes, and [bilateral] levator scap[ulae]," and "significant cervical spine dysfunction including impaired joint mobility, weakness, abnormal tissue tension and postural impairments," (AR 1542-43);

- Banner Fort Collins Medical Center ED providers' June 2019 examination finding of limited active and passive range of motion associated with Ms. Murphy's left shoulder pain radiating to the left side of the neck, (AR 509-10);

- FNP Staatz's December 2020 observations, at an appointment for an "incapacitating" headache, that Ms. Murphy was "in pain," "lying in [a] dark room with sunglasses on, wrapped in [a] blanket," and that her left anterior cervical lymph node was tender and enlarged, (AR 527-29);

- Dr. Golen's additional February 2021 examination findings that Ms. Murphy was "[v]ery tender over occipital insertion points slightly less so on cervical paraspinals and trapezius insertion points" and had "slightly tender" sternocleidomastoids, (AR 1257);

- Dr. Golen's March 2021 and August 2021 examination findings that Ms. Murphy remained "[v]ery tender over occipital insertion points slightly less so on cervical paraspinals and trapezius insertion points" and still had "slightly tender" sternocleidomastoids, (AR 1260, 1274); and,

- FNP Staatz's May 2021 examination finding of tenderness of Ms. Murphy's cervical spine, (AR 1407-08).

Thus, the ALJ's reliance on "normal physical examination findings" to omit any limitations related

to Ms. Murphy's headaches from the challenged RFC is not supported by substantial evidence.

*Pickup*, 606 F. App'x at 433; *Stills*, 476 F. App'x at 161.

The ALJ's next proffered reason of "mild diagnostic evidence," (AR 41), does not appear to relate to Ms. Murphy's headache impairments, because the ALJ referenced only one diagnostic test—a head CT scan—in her step-four discussion of these impairments,[42] and she asserted that the results of this test were normal. (AR 39-40.) As it happens, the ALJ was mistaken on this point, because the CT scan in question showed "[m]ild white matter presumed chronic microangiopathic ischemic changes." (AR 592.) But regardless of whether the CT scan results were normal or mildly abnormal, the ALJ failed to explain why these results would tend to contradict Ms. Murphy's diagnoses of migraines and occipital neuralgia or her reported symptoms related to these disorders, nor is such a contradiction obvious.[43] (AR 40.) The ALJ therefore failed to adequately explain her reliance, if any, on "mild diagnostic evidence" to justify the omission of headache-related limitations from the challenged RFC.

Finally, there are two related problems with the ALJ's vague reference to Ms. Murphy's "independent activities of daily living" to support the omission from Ms. Murphy's RFC of any limitations associated with her headache disorders. First, as discussed in Section IV.A., *supra*, the ALJ either failed to address, or inadequately explained why she rejected, Ms. Murphy's testimony and reports about her limited ability to drive, shop, cook, do household chores, and engage in hobbies. (*See* AR 36, 67, 75-78, 379-83, 1154-56, 1159-60.) It is therefore unclear whether the ALJ properly considered this evidence in assessing Ms. Murphy's usual activities of daily living.

---

[42] The ALJ does also reference an April 2019 myocardial perfusion scan in her step-four discussion of Ms. Murphy's migraines, but she does not explain how this cardiac test might conceivably pertain to Ms. Murphy's headache disorders, nor is such a connection obvious. (AR 40 (citing AR 755)); *see, e.g.,* American Heart Association, "Myocardial Perfusion Imaging Test," https://www.heart.org/en/health-topics/heart-attack/diagnosing-a-heart-attack/myocardial-perfusion-imaging-mpi-test (last accessed Jan. 24, 2024) ("Myocardial perfusion imaging (MPI) is a non-invasive imaging test that shows how well blood flows through your heart muscle.").

[43] "There is no lab test or imaging study that can rule in or rule out migraine." Mayo Clinic, "What is a migraine?," https://www.mayoclinic.org/diseases-conditions/migraine-headache/multimedia/vid-20535928 (last accessed Jan. 24, 2024); *see also, e.g.*, Cleveland Clinic, "Occipital Neuralgia," https://my.clevelandclinic.org/health/diseases/23072-occipital-neuralgia (last accessed Jan. 24, 2024) ("No one conclusive test will confirm occipital neuralgia.").

Second, nowhere did the ALJ cite to any testimony or reports that Ms. Murphy can or does engage in her usual activities of daily living when she has a severe headache, and there is record evidence to the contrary that the ALJ did not discuss. Specifically, on December 1, 2020, when Ms. Murphy presented to FNP Staatz with an "incapacitating" headache, FNP Staatz observed that Ms. Murphy was "lying in [a] dark room with sunglasses on, wrapped in [a] blanket." (AR 529.) And at her June 2022 hearing, Ms. Murphy testified that when she has a headache, three days out of four, the pain is so bad she "can't even get out of bed." (AR 78.) Thus, the ALJ did not adequately explain her reliance on Ms. Murphy's activities of daily living to omit any limitations associated with headaches from Ms. Murphy's RFC.

And if the foregoing were not enough, there are other problems in ALJ's step-four discussion of Ms. Murphy's headache disorders. Addressing Ms. Murphy's December 1, 2020, visit to the Banner Fort Collins Medical Center ED, the ALJ asserted that the onset of Ms. Murphy's severe headache was "just '1 hour' ago." (AR 40 (citing AR 471).) However, the ALJ failed to discuss that: (a) Ms. Murphy presented to FNP Staatz at 11:45 a.m. on December 1, 2020, seeking treatment for the headache in question and reporting an onset of "1 day," (AR 527); (b) Ms. Murphy presented to the ED at 12:45 p.m., one hour later, (AR 471); and, (c) although ED providers did note that the headache onset was "1 hours [sic] ago," they also noted that it started "around 1000." (AR 471.) In other words, for Ms. Murphy to have presented to the ED only one hour after the headache started, she would have had to have presented to FNP Staatz *the very instant* the headache started, and FNP Staatz's and ED providers' notations of an earlier onset would both have to be wrong. Yet the ALJ did not explain why she chose to credit this frankly implausible scenario. (AR 40.) Further, even if the headache *did* start only one hour before Ms. Murphy presented to the ED, the ALJ did not explain why this fact would tend to discredit that the

headache was "incapacitating" and "not much improved" even after the ED administered intravenous fluids, Ativan, and Zofran. (AR 40, 478, 527.)

Another problem with the ALJ's step-four discussion of Ms. Murphy's migraines is her assertion that, "[o]ther than emergency room medication, primary care provider noted no prescription for migraines." (AR 40.) The ALJ did not support this assertion with any citation to the record, and it is plainly wrong. In addition to the Percocet, Phenergan, Naprosyn, and Flexeril that ED providers prescribed for Ms. Murphy on December 1, 2020, (AR 479), Ms. Murphy's primary care practice prescribed the beta blocker propranolol for headache prevention the following day. (AR 526.)

The ALJ did correctly note Ms. Murphy's reports to Dr. Golen in February 2021, and to FNP Staatz in June 2021, that her migraines were improved on propranolol. (AR 40.) In doing so, however, the ALJ did not mention that:  (1) in February 2021, Ms. Murphy told Dr. Golen that, though her migraines had "improved remarkably on beta-blocker," her "head and neck pain persists" and her daily "headaches" were "interspersed with migraine headaches," (AR 1256); (2) in April 2021, Ms. Murphy told FNP Staatz that though her headaches had improved since starting propranolol, "[t]hey still occur daily," (AR 1411); (3) in June 2021, Ms. Murphy told FNP Staatz that despite the improvement with propranolol she still had "[f]requent [h]eadaches," (AR 1404); (4) in November 2021, Dr. Golen noted that Ms. Murphy's headaches and neck pain had been "resistant to all treatments so far," (AR 1277); and, (5) in January 2022, Ms. Murphy told Dr. Carpenter that she "continue[d] to have severe migraines as well as … neck … pain." (AR 1356.) Because the ALJ failed to discuss any of this significantly probative evidence, it is unclear whether she considered it in omitting any limitations associated with headaches from the challenged RFC.

Finally, nowhere in her step-four discussion of Ms. Murphy's headaches did the ALJ mention the medical record evidence indicating that Ms. Murphy's migraines cause photophobia and phonophobia and are aggravated by bright lights. (AR 40; *see* AR 527-29, 702-05.) It is thus unclear whether the ALJ considered this evidence in omitting from Ms. Murphy's RFC any environmental limitations regarding exposure to bright lights and/or loud noises.

In all of the foregoing respects, the ALJ did not adequately "discuss the uncontroverted evidence [she chose] not to rely upon, as well as significantly probative evidence" she appears to have rejected, in omitting from Ms. Murphy's RFC any limitations associated with headaches. *Clifton*, 79 F.3d at 1009-10. As such, she did not provide the Court with "a sufficient basis to determine that appropriate legal principles have been followed" and that substantial evidence supports her decision. *Jensen*, 436 F.3d at 1165. Because the ALJ did not adequately explain why she omitted any limitations related to Ms. Murphy's headache disorders from the challenged RFC, I recommend that the Court grant Ms. Murphy's Motion and remand this matter to the Commissioner for further proceedings.

### C.  The ALJ's errors were not harmless.

The Commissioner does not specifically argue that any of the errors discussed in Section IV.A. and B., *supra*, are harmless. (*See generally* Doc. 23.) However, he does make the general observation that "the federal 'harmless error' statute … requires this [C]ourt, acting in its appellate role, to examine the record and apply case-specific judgment to determine whether any error by the ALJ is harmless." (*Id.* at 3 (citing *Shinseki v. Sanders*, 556 U.S. 396, 407 (2009).)

The Tenth Circuit "appl[ies] harmless error analysis cautiously in the administrative review setting." *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005). Still,

> harmless error analysis … may be appropriate to supply a missing dispositive finding where, based on material the ALJ did at least consider (just not properly),

we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.[44]

*Id.* at 733-34 (quotation marks and ellipses omitted).

Here, a reasonable ALJ following the correct analysis could have resolved the factual matters discussed in Sections IV.A. and B., *supra*, in other ways. Specifically, on the basis of the record evidence, including the evidence the ALJ described inaccurately or failed to discuss, a reasonable factfinder could have included in Ms. Murphy's RFC manipulative limitations due to her hand and wrist joint impairments, and/or unscheduled-absence and/or environmental limitations due to her headache disorders. Further, the VE's testimony suggests that certain manipulative or unscheduled-absence limitations would eliminate any jobs existing in significant numbers in the national economy that a hypothetical person with Ms. Murphy's assessed RFC could perform. (AR 84-86.) As such, the ALJ's failure to adequately explain why she did not include any such limitations in the challenged RFC is not harmless.

## V.  Conclusion

For the reasons stated above, I recommend that the request for reversal and remand in Plaintiff's Opening Brief (Doc. 15) be GRANTED, and that the Commissioner's decision denying Ms. Murphy's claims for DIB and SSI be REVERSED and this matter REMANDED to the Commissioner for further proceedings in accordance with these Proposed Findings and Recommended Disposition.

**Timely objections may be made pursuant to 28 U.S.C. § 636(b)(1)(C).  Within fourteen (14) days after a party is served with a copy of these proposed findings and recommended disposition that party may, pursuant to Section 636(b)(1)(C), file written**

---

[44] However, courts "cannot attempt to supply a missing finding for the ALJ on legal or evidentiary matters that [she] did not consider because it risks violating the general rule against post hoc justification of administrative action." *Dye v. Barnhart*, 180 F. App'x 27, 31 (10th Cir. 2006) (quotation marks omitted).

objections to such proposed findings and recommended disposition with the Clerk of the United States District Court for the District of New Mexico.  A party must file any objections within the fourteen-day period allowed if that party wants appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.

KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE